IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

CELESTE ALEXANDER                                                        PLAINTIFF

v.                              CASE NO.  5:16-CV-00300 BSM

PINE BLUFF SCHOOL DISTRICT NO. 3,
JEFFERSON COUNTY, PINE BLUFF, ARKANSAS,
and MICHAEL NELLUMS, individually                          DEFENDANTS

<u>ORDER</u>

Defendant Pine Bluff School District's ("PBSD") motion for summary judgment [Doc. No.35] and defendant Michael Nellums's motion for summary judgment [Doc. No. 42] are denied.

## I.  BACKGROUND

Plaintiff Celeste Alexander holds an Arkansas license to teach math for grades seven through twelve and has performed work for PBSD from 2003 to 2015.  Alexander began working for PBSD on September 19, 2014, as a "math lab instructor" with "other duties as assigned by the superintendent."  *See* Pl.'s Ex. 6 ("Teacher's Contract").  She claims that Nellums, a principal at PBSD, began flirting and asking her out on dates soon after she began her job as the math lab teacher, and his sexual advances and harassment became more extreme as she continued her work.  According to Alexander, Nellums conveyed to her on multiple occasions that he was very powerful, and he could use his power to her advantage or disadvantage.  In September or October, Alexander made a verbal complaint about Nellums's advances to Reginald Wilson, a PBSD assistant principal, who dismissed

Nellums's conduct as harmless jest and flirtation.  Wilson made Nellums aware of Alexander's complaint, Wilson Dep. 130:19–131:3, but took no further action.  After Alexander unequivocally rejected Nellums's advances on or around November 21, 2014, she claims Nellums began retaliating against her by manipulating her schedule and job responsibilities in a way that rendered compliance impossible.

The most salient change to Alexander's job responsibilities included multiple closings and reopenings of the math lab she was hired to coordinate.  A confusing and disorganized state of affairs ensued in which Alexander was directed by various supervisors and colleagues to stay in the math lab at times and to sit in on other teachers' classrooms to supplement their courses at other times.  This created friction between Alexander, her colleagues, and the administration.  Alexander was consistently condemned for having a poor attitude and for being unable to accommodate the changes associated with her job.  The defendants attribute the changes made to Alexander's schedule to the discovery of Tiffani Bone, assistant superintendent for learning services, that students were leaving their core classes to go to Alexander's math lab, thus violating Arkansas Department of Education ("ADE") standards (commonly referred to as "seat time law").  Pl.'s Resp. to Nellums's SOF ¶¶ 26–31, Doc. No. 54-1; Pl's Resp. to PBSD's SOF ¶¶ 16–17, Doc. No. 55-1.  Bone advised Nellums that Alexander's math lab instruction could be used to supplement but not to replace students' core classes and to cease the practice immediately.  Bone Dep. 17:9–18:11, 31:19–32:18.  Alexander states Bone first discovered this in October of 2014, but Nellums did not follow Bone's advice until January of 2015 when he closed the lab for the first time.

Alexander Dep. 36:9–18, 142:6; Bone Dep. 29:14; Pl.'s Ex. 22, (Jan. 23 letter to "Math Teachers" from Wilson and Caldwell). The math lab was opened and closed multiple times thereafter and in ways that appear to have continued to violate seat time law by allowing students to leave their core classes to attend the math lab. Pl.'s Ex. 27 at 2 (revised weekly schedule stating "[a]ll students will attend the lab 2 days and attend class 3 days").

On April 22, 2015, Alexander received notice that she was being included in a reduction in force ("RIF"). Pl.'s Ex. 9 (Apr. 22 letter from Mary Harvey to Alexander). She filed a formal grievance regarding Nellums's alleged sexual harassment with PBSD on June 3, 2015. Pl.'s Ex. 13 (Alexander's PBSD "Employee Grievance Form"). Nellums filed a formal grievance in response on June 22, 2015, in which he stated, "Dr. Alexander is an abject liar, and should be accordingly sanctioned by the board, and should never be eligible for re-employment in the Pine Bluff School district." Pl.'s Ex. 18 (Nellums's PBSD "Employee Grievance Form"). Alexander filed a complaint with the ADE on July 2, 2015. She filed a charge of discrimination with the EEOC and was issued notice of her right to sue on June 24, 2016. All investigations found Alexander's complaints to be unfounded. Consistent with Nellums's proscription, Alexander has not been rehired by PBSD.

Defendants now move for summary judgment on all of Alexander's claims. Four claims remain against PBSD: sexual harassment and retaliation under the ACRA, retaliation under Title VII, and promissory estoppel. Doc. No. 55, at 23 (Alexander stating she is waiving all other claims against PBSD). The only claim remaining against Nellums is for retaliation under the ACRA. Doc. No. 54, at 23 (Alexander stating she is waiving all other

claims against Nellums).

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986).  Once the moving party demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings.  *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011).  Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute requiring a trial.  *Id.*  Importantly, when considering a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the nonmoving party.  *Holland  v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007).  Additionally, the evidence is not weighed, and no credibility determinations are made.  *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III.  DISCUSSION

A.  <u>Sexual Harassment</u>

*1.  Hostile Work Environment*

Claims for sexual harassment brought under the ACRA are analyzed in the same manner as those under Title VII.  *Island v. Buena Vista Resort*, 103 S.W.3d 671, 676 (2003).  To prove a claim of hostile work environment, Alexander must show that (1) she was a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of

4

employment; and (5) her employer knew or should have known of the harassment and failed to take appropriate remedial action. *Nichols v. Tri-Nat'l Logistics, Inc.*, 809 F.3d 981, 985 (8th Cir. 2016).

Alexander is a woman, and the record shows that she was subjected to unwelcome harassment based on her sex. The first three elements of her prima facie claim are satisfied.

The fourth element presents a demanding standard. *Id.*; *LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005). To qualify, the harassment must be severe or pervasive, not merely rude or unpleasant. *Id.* The totality of the circumstances is examined to determine whether the harassment created an environment that was sufficiently hostile and offensive both subjectively and objectively. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999). Relevant factors include the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*

When the evidence is viewed in the light most favorable to Alexander, there is evidence upon which a jury can determine that Nellums's sexual harassment of Alexander was severe or pervasive so as to have affected a term, condition, or privilege of her employment. Alexander represents that Nellums's sexual harassment intensified steadily throughout the school year. She acknowledges that "there [were] many times during those months that [she] had a completely professional conversation with him." Alexander Dep. 82:6, 224:5. On other occasions, however, the communications were not so professional such as on November 6, 2014, when Nellums stood close behind Alexander during a teacher

5

training, put his hands on her shoulders, and eventually sat close beside her. *Id.* 189:21.

Then, on November 10, 2014, Nellums summoned Alexander to his office and offered to take

care of her and invited her to his home to see his "big deck." *Id.* 210:1–25; Pl.'s Ex. 15, at

2 (Memo on "Michael Nellums Sexual Harassment of Celeste M. Alexander"). When she

declined, he told her that he could take care of her if she would just let him, that she was

independent to a fault, that she needed a man to care for her, and that he was that man. Pl.'s

Ex. 15, at 1. She responded that she did not need to be cared for and has someone in her life.

*Id.* He said he was a better option, that he likes competition, and that he always wins. *Id.*

1–2. He said he needed her in his life and to please visit him at his home. *Id.* at 2. When

she walked to her car, he followed her out, despite her objection, and placed his hand on her

back. *Id.* When the two shook hands, he slid his finger up and down Alexander's palm

suggestively. *Id.* Alexander also states that Nellums has hugged her inappropriately but

admits that these occasions are the extent of his physical contact. Alexander Dep.

229:11–230:17.

On November 21, 2014, the electricity went out in Alexander's vacant classroom, and

Nellums paid her a visit. Pl.'s Ex. 15, at 2, 3. Nellums again told Alexander that he wanted

to take care of her, that she was independent to a fault, that he liked that she was a "good

girl," that he wanted to have fun with her and wanted her near to him, that he is the second

most powerful person in Pine Bluff, that he would be the next superintendent and could get

her a job making six figures, that he has helped lots of people in the administration attain

their positions, that he has never had someone reject one of his offers, that he cannot help her

6

if she would not let him, that "sometimes we don't know what's best for us," and that Alexander was "a total package." *Id.* Alexander says that she unequivocally rejected his advances by saying, "Dr. Nellums, your relationship with me is strictly professional and it will remain strictly professional." *Id.*; Alexander Dep. 82:10–83:3; 221:13–222:3 (explaining that November 21 was the time when Nellums told Alexander she owed him).

Other offenses enumerated by Alexander, without respect to when or where they occurred, include things such as Nellums asking her about her marriage plans; telling her that he is investing in his own future by hiring her; telling her she looks good in her clothes; giving her gifts; and being generally flirtatious and unprofessional.

Alexander also explains that, after she rejected him, Nellums manifested his sexual harassment by changing her math lab duties and her schedule constantly so that she could not comply with instructions and was perceived negatively by PBSD faculty, thus making it easier to ultimately justify terminating her. *See* Collins Decl. ¶¶ 14–16; Alexander Dep. 5–17 (explaining that Cheryl Caldwell signed the letter closing the math lab at Nellums's bequest because she was afraid not to sign it). The record contains enough facts showing that Alexander constantly struggled to meet the ever-changing demands placed on her, *see, e.g.*, Pl.'s Ex. 28 (Alexander's Feb. 22 "Response to Memo"); that she was constantly reprimanded by her colleagues and supervisors; and that many of her colleagues now believe she is difficult to work with and cannot handle change. This is cited as one reason why she should never be rehired by PBSD. Wilson Dep. 48:23–49:18.

Finally, knowledge may be attributed to Alexander's employer who failed to take

7

appropriate remedial action.  *See Cross v. Cleaver*, 142 F.3d 1059, 1073 (8th Cir. 1998) (discussing circumstances under which knowledge element is automatically satisfied).  This is so because an employer is strictly liable when a supervisor's harassment culminates in tangible employment action.  *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).  An employee is a "supervisor" under Title VII if he is empowered by the employer to take tangible employment actions against the victim.  *Id.*  The facts show that Nellums was a supervisor, empowered by PBSD to take tangible employment actions against Alexander. Bone Dep. 8:19–9:1 (explaining that school board's recommendation to hire came from the high school principal or its committee through the superintendent); Wilson Dep. 15:14–19; Smith Dep. 85:4–10, 87:8–10; Harvey-Evans Dep. 112:22–113:5.

The harassment culminated in tangible adverse employment action.  In addition to having her schedule and duties manipulated, Alexander was terminated; Nellums recommended that she never be hired by PBSD again; and so far, she has not been rehired by PBSD, as discussed in greater detail below.  *Xuan Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 959 (8th Cir. 2015) ("Adverse employment actions 'include termination, demotion, transfers involving changes in pay or working conditions, and negative evaluations used as the basis for other employment actions.'") (quoting *Scusa*, 181 F.3d at 969).

Viewing the facts in the light most favorable to Alexander, she has met her prima facie claim for sexual harassment.

## 2.  *Quid Pro Quo*

Although it is not addressed by the parties, Alexander's narrative also fits a theory of

quid pro quo sexual harassment. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1006 (8th Cir. 2000) ("the terms 'quid pro quo' and 'hostile environment' remain relevant only to the extent they illustrate the evidentiary distinction between cases involving threats which are carried out and those featuring offensive conduct in general"). Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands." *Anderson v. Family Dollar Stores of Arkansas, Inc*., 579 F.3d 858, 863 (8th Cir. 2009). A prima facie case of quid pro quo sexual harassment requires Alexander to show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in adverse employment action. *Id.* at 676–77 (citing *Cram v. Lamson & Sessions Co.*, 49 F.3d 466 (8th Cir. 1995)). Quid pro quo sexual harassment does not require the harassment to be severe or pervasive because any carried-out threat is an actionable change in the terms or conditions of employment. *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 863 (8th Cir. 2009). Further, the employer will be strictly liable for quid pro quo harassment, without regard for the knowledge requirement, because the harasser, "by definition, wields the employer's authority to alter the terms and conditions of employment–either actually or apparently." *Cross*, 142 F.3d at 1073.

Alexander claims that Nellums made a habit of making it clear that he could use his power to her benefit or detriment. She says on November 10, 2014, she rebuffed his

advances, and he told her that he could take care of her if she would just let him, that she was independent to a fault, and that she needed a man to care for her and offered to be that man. Pl.'s Ex. 15.  She responded that she did not need to be cared for and has someone in her life. *Id.*  He said he was a better option, that he liked competition, and that he always wins.  *Id.* He said he needed her in his life and to please visit him at his house.  *Id.*  This was the same occasion on which Alexander says Nellums invited her to come to his house to have dinner and see his "big deck" and gave her a sexually suggestive handshake in which he rubbed his finger across her palm.  *Id.*

On November 21, 2014, when the electricity was out in Alexander's classroom, Nellums again told Alexander he wanted to take care of her, she was independent to a fault, that he liked that she was a good girl, that he wanted to have fun with her, that he was the second most powerful person in Pine Bluff, that he would be the next superintendent and could get her a job making six figures, that he has helped lots of people in the administration attain their positions, that he had never had someone reject one of his offers, and that Alexander was "a total package."  *Id.*  Alexander says this is the date on which she unequivocally rejected his advances by saying, "Dr. Nellums, your relationship with me is strictly professional and it will remain strictly professional."  *Id.*; Alexander Dep. 82:10–83:3; 221:13–222:3 (explaining that November 21 was the time when Nellums told Alexander she owed him).

Viewing the evidence in a light most favorable to Alexander, she has established a dispute of fact as to whether her submission to Nellums's unwelcome sexual advances was

an express or implied condition for receiving job benefits.  Alexander has also established a dispute of fact as to whether her refusal to submit to Nellums resulted in adverse employment action.  Alexander asserts Nellums and PBSD included her in a RIF and refused to honor her right to be recalled because she rejected Nellums's advances.  PBSD sent Alexander a letter on April 22, 2015, noticing her as to her inclusion in a RIF and her right to be recalled for up to two years.  Pl.'s Ex. 9 (Apr. 22, 2015 letter from Mary Harvey to Alexander).  Additionally, Nellums filed a grievance against Alexander in which he referred to her as an "abject liar" and insisted she never be hired by PBSD again.  Pl.'s Ex. 18 (Nellums's "Employee Grievance Form").  Alexander states that Cheryl Hatley, PBSD chief of staff and hearings officer, told her she would never be hired in the district again because of Nellums's proscription.  Alexander Dep. 254:23–255:21.  All of these actions constitute adverse employment action.  Alexander asserts that despite her right to be rehired, and despite the fact that PBHS has hired other, less qualified math teachers since she was terminated, Wilson Dep. 47:17–25; Nellums Dep. 60:14–64:25, PBSD has not rehired her.  PBSD says it has not rehired Alexander, in part, because Alexander has never reapplied.  PBSD policy shows, however, that employees terminated as a result of inclusion in a RIF are recalled based on seniority and qualifications and that they need not reapply.  Pl's. Ex. 3, at 41–43 ("Reduction of Force (ROF) Policy"); Pl.'s Ex. 17 ¶ 3 (May 5, 2016 email from Jerry Malone to Rodney Phillips).

The defendants assert that a period of more than a couple of months is too great a time span to establish a causal connection.  If Alexander's final rejection of Nellums occurred

November 21, 2014, and Alexander was included in the RIF on April 22, 2015, then it is true that approximately five months separated Alexander's rejection of Nellums from any adverse employment action. A gap in time may weaken the inference of an impermissible motive, but it is not dispositive. *See Burkhart v. American Railcar Industries*, *Inc.*, 603 F.3d 472, 477 (8th Cir. 2010). According to defendants' argument, employers would have impunity to discriminate on the basis of sex as long as they bided their time until the employee's contract expired. *Walker v. Bd. of Regents of University of Wisconsin System*, 300 F. Supp 2d 836, 852 (W.D. Wis. 2004). Title VII does not require such a result. *Id.*

The first and third elements of Alexander's quid pro quo claim are not at issue as it is clear that Alexander is a woman, and the type of harassment alleged is based on her sex. Thus, Alexander has satisfied her prima facie claim for quid pro quo sexual harassment.

Defendants assert that Alexander lost her job as a result of legitimate, non-discriminatory reasons. They argue that Alexander's position was for one year contingent on Title I funding. The evidence shows, however, that Alexander was terminated before PBSD ever had an opportunity to apply for Title I funding. Martin-Russell Dep. 42:2–45:1. Alexander also states that every contract she has signed since 2003 has been for a one-year term. Alexander Dep. 75:16. Furthermore, if it was indeed the case that Alexander's contract simply expired, it is unclear why PBSD needed to include Alexander in its RIF and expressly notice her as to her recall rights, which it indisputably did. Pl.'s Ex. 9 (Apr. 22, 2015 letter from Mary Harvey to Alexander). It is also unclear why PBSD represented to an EEOC investigator that Alexander "was not covered by the RIF" after sending her a letter

12

stating otherwise.  Pl.'s Ex. 17 (May 5, 2016 email from Jerry Malone to Rodney Phillips).

Shifting justifications for adverse employment action can indicate pretext.  *Mervine v. Plant Eng'g Servs.*, LLC, 859 F.3d 519, 528 (8th Cir. 2017).

A quid pro quo theory also supports the denial of PBSD's motion for summary judgment with respect to Alexander's sexual harassment claim.

   B.   Retaliation

As with sexual harassment claims, claims of retaliation under Title VII and the ACRA are analyzed in the same manner.  *Burkhart*, 603 F.3d at 477.  Title VII makes it unlawful for an employer to discriminate against its employees for opposing any unlawful employment practice.  42 U.S.C. § 2000e-3(a).  The opposition clause applies broadly to cover employment actions that are not unlawful as long as the employee acted with a good faith, objectively reasonable belief that the practices were unlawful.  *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016).

To state a prima facie case of retaliation, Alexander must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  *Id.*  If Alexander meets this burden, and if a defendant proffers a legitimate, non-retaliatory reason for the adverse action, Alexander must present evidence that creates a reasonable inference that the proffered legitimate reason is mere pretext for the defendant's retaliation.  *Id.*

The filing of incident reports and grievances, charges of discrimination with the EEOC, and lawsuits are protected activity.  *Sutherland v. Missouri Dep't of Corrections*, 580

13

F.3d, 748, 752 (8th Cir. 2009).  Even informal comments opposing discrimination can constitute protected activity.  *See, e.g.*, *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011) ("Accepting Pye's version of what was said at the November 15, 2007 meeting, his comments at the meeting would also have been protected conduct.").

Alexander cites several occasions on which she claims to have engaged in protected activity prior to her formal grievance on June 3, 2015.  First, she characterizes her final rejection of Nellums on November 21, 2014, as protected activity.  This conduct seems to fit more squarely under a quid pro quo sexual harassment theory, and other jurisdictions have held that protected activity requires an employee to take action adverse to the company. *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 49 (1st Cir. 2010).  Without deciding the issue, other conduct on the part of Alexander clearly satisfies the concept of protected activity.

In late September or early October, Alexander told Wilson that she was uncomfortable being alone with Nellums because he was overly flirtatious.  Alexander Dep. 203:25–204:22. Wilson attributed Nellums's behavior simply to being a function of his personality and jokester tendencies.  Wilson Dep. 204:13 (Wilson says Nellums is just joking and is a flirt–"that's just how he is").  Alexander responded that she did not find the situation funny because Nellums repeatedly asked her out on dates and was not accepting no for an answer. Alexander did not say anything about "sexual harassment" per se to Wilson.  Further, Alexander's formal grievance listed offensive conduct occurring in November of 2014 and on.  The evidence supports that Alexander believed she was complaining about inappropriate

14

flirting but not unlawful conduct when she complained to Wilson prior to November.  Thus, this occasion does not constitute protected activity.  *See, e.g.*, *Helton v. Southland Racing Corp.*, 600 F.3d 954, 961 (8th Cir. 2010) ("Because she acknowledged that she said nothing in that call about race discrimination, her conversation was not protected conduct under Title VII, and so any action take in response to the conversation cannot be actionable under Title VII.").

Next, Alexander sent two different emails to various PBSD staff.  On February 3, 2015, Alexander sent an email to Wilson in which she explained that she would not be following a schedule as directed because it "would only continue to expose [Alexander] to harassment and a hostile work environment."  Pl.'s Ex. 27.  Staff copied on the email included Alexander's mother, Nellums, and Andrea Johnson.  *Id.*  On February 22, 2015, Alexander sent an email to Nellums, copying her mother; Wilson; Johnson; Alesia Smith; Tiffany Bone; and others, in which she stated, "I am pleading for this repeated harassment and assassination of my character to cease."  Pl.'s Ex. 28.  Again, these emails do not qualify as protected activity because none of the words contained in the emails were sufficient to put anyone on notice of sexual harassment.  *See* Bone Dep. 45:2–5; Johnson Dep. 60:17–62:2; Wilson Dep. 130:5–18.

No one disputes that the formal grievance Alexander submitted to PBSD on June 3, 2015, qualifies as protected activity.  *See also Sutherland*, 580 F.3d at 752.  The next question, therefore, is whether adverse employment action followed.  "An adverse employment action is a tangible change in working conditions that produces a material

15

employment disadvantage. *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000). Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects qualify, but minor inconveniences or alterations to work responsibilities do not. *Id.*

Alexander received notice that she was included in PBSD's RIF on April 22, 2015, well before she submitted her formal grievance to PBSD. It is generally true that there can be no causal connection when the adverse employment action occurs before the protected activity. *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 933 (8th Cir. 2011). Nellums's recommendation, however, that Alexander never be rehired occurred on June 22nd, after Alexander submitted her formal grievance, and the refusal to renew a contract qualifies as adverse employment action. *Walker*, 300 F. Supp 2d at 852–53. Alexander was told she had recall rights, and she has not been rehired although other math teachers have. "If the reason defendants did not renew plaintiff's contract was her race or sex, they violated the law." *Id.*

The contents of Nellums's grievance are sufficient to allow the inference of a causal connection between Alexander's protected activity and the adverse employment action. *See* Pl.'s Ex. 18 (Nellums's "Employee Grievance Form"). Further, Alexander states she was told by personnel that the superintendent expressed that Nellums's request that Alexander not be rehired would be honored. Alexander Dep. 254:23–255:21.

Nellums asserts that he did not have the authority to terminate or recall Alexander; therefore, there can be no causal connection between the protected activity and adverse action. The record contains abundant support, however, of the fact that Nellums acted as an

agent for PBSD and made recommendations for the hiring and firing of teachers.  Pl.'s Ex. 25 (February 19 memo from Nellums to Alexander in which Nellums identifies himself as an agent acting on behalf of the superintendent); Bone Dep. 8:19–9:1 (explaining that school board's recommendation to hire came from the high school principal or its committee through the superintendent); Wilson Dep. 15:14–19; Smith Dep. 85:4–10, 87:8–10; Harvey-Evans Dep. 112:22–113:5.  Additionally, evidence shows that Nellums has been responsible for the inclusion of other teachers in RIF events.  *See* Collins Decl., Pl.'s Ex. 76 ¶¶ 8–12 (Assistant principal Earlene Collins says Adkison complained to her about Nellums's harassment, Collins spoke to Nellums about it, Adkison was listed on an RIF days later, then Adkison's name was removed after Collins confronted Nellums about his placing Adkison in the RIF.).  Accordingly, the argument that Nellums did not have the authority to terminate or rehire Alexander is unconvincing.

Viewing the facts in a light most favorable to Alexander, she has satisfied her prima facie case of retaliation.  And, although defendants insist that the adverse employment actions against Alexander was a legitimate result of her contract's expiration, Alexander has presented sufficient evidence to raise a genuine doubt as to the legitimacy of that motive. *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 717 (8th Cir. 2000) (discussing the summary judgment standard in retaliation claim).  Defendants' motions for summary judgment are therefore denied with respect to Alexander's retaliation claims.

C.    Promissory Estoppel

To prove promissory estoppel, Alexander must show that (1) PBSD made a promise,

17

(2) PBSD should have reasonably expected Alexander to rely on the promise, (3) Alexander did reasonably rely on the promise to her detriment, and (4) injustice can be avoided only by enforcing the promise. *Fairpark, LLC v. Healthcare Essentials*, 381 S.W.3d 852, 859 (Ark. 2011). The question of whether promissory estoppel is applicable is for the trier of fact. *Id.*

A promise is "a manifestation of intention to act or refrain from acting in a specified way, so made to justify a promisee in understanding that a commitment has been made." *Id.* PBSD's sexual harassment policy states, "It is the policy of the Pine Bluff School District to maintain a learning and working environment that is free from sex discrimination, including sexual harassment." Pl.'s Ex. 3, at 44 ("Sexual Harassment Policy"). Under the policy, sexual harassment "may include but is not limited to . . . verbal harassment or abuse, pressure for sexual activity, repeated remarks to a person with sexual or demeaning implications, suggesting or demanding sexual involvement accompanied by implied or explicit threats concerning one's grades, job, etc., . . . any sexually motivated unwelcome touching." *Id.* In this regard, PBSD's sexual harassment policy is arguably more expansive than Title VII, which requires severe and pervasive harassment. The policy expressly allows verbal complaints, and provides that "reporting sexual harassment or sex discrimination will not reflect upon the individual's status nor will it affect future employment, grades, or work assignments." *Id.* at 45. The policy could reasonably be construed as a promise by PBSD to prohibit Nellums's conduct, to take allegations of sexual harassment seriously, and to ensure those who file charges in good faith are not retaliated against. *Id.* ("The district will discipline any individual who retaliates against any person. . . To the extent possible,

information provided and those who provided it will remain confidential.").

Assuming the policy does constitute a promise, PBSD could have reasonably expected Alexander and all its employees to rely on its sexual harassment policy because employer policy manuals are made available to employees specifically for that reason.

Alexander's verbal report to Wilson and her formal grievance submitted on June 3, 2015, could constitute reasonable and detrimental reliance.  The substance of the verbal complaint Alexander made to Wilson could qualify as a complaint of conduct prohibited under PBSD's sexual harassment policy, and the substance of her formal grievance certainly qualifies.  The reasonableness of Alexander's reliance on the policy presents more fact issues: In light of the policy's directive to "report the alleged act as soon as possible to their supervisor," *id.* at 44, did Alexander report Nellums's conduct timely, and did Alexander make her reports to the appropriate person?  Wilson admits the only person he discussed Alexander's verbal complaint with was Nellums, and if the defendants are found to have retaliated against Alexander for complaining, then detrimental reliance is satisfied.

Finally, if the aforementioned elements are proven, it would be reasonable to conclude that justice requires enforcing the promises PBSD made through its sexual harassment policy.

For these reasons, PBSD's motion for summary judgment is denied with respect to Alexander's promissory estoppel claim.

## IV.  CONCLUSION

For the reasons stated herein, defendants' motions for summary judgment [Doc. Nos. 35, 42] are denied.

19

IT IS SO ORDERED this 19th day of March 2018.

_____
UNITED STATES DISTRICT JUDGE